HÉCTOR L. VÁZQUEZ ET AL., demandantes y recurridos, *v.* HÉCTOR SÁNCHEZ, S. en C. y la AMERICAN SURETY COMPANY OF NEW YORK, demandadas y recurrente la primera.

*Número:* 59. *Resuelto:* 28 de mayo de 1962.

*Daniel Pellón Lafuente,* abogado del recurrente; *Joshua Hellinger,* abogado de Mary Sánchez de Vázquez.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Bécerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

En 15 de julio de 1948 Héctor Vázquez y su esposa Mary Sánchez radicaron demanda enmendada de daños contra la sociedad en comandita Héctor Sánchez S. en C., y American Surety Co., en la anterior Corte de Distrito de San Juan. En 26 de diciembre de 1950 se dictó sentencia condenando a las demandadas a satisfacer a la sociedad de gananciales constituída por los demandantes $12,360.25, obligada la American Surety hasta $10,000 límite de su póliza; las costas y $2,000 de honorarios de abogado. La Corte concluyó que los daños sufridos por los demandantes fueron consecuencia de un accidente de automóvil debido única y exclusivamente a la negligencia de un empleado de la sociedad demandada Héctor Sánchez S. en C., en el desempeño de su empleo como repartidor de hielo.

La American Surety consignó la suma de $13,962.77 en descargo de su obligación. La codemandada Héctor Sánchez S. en C., apeló (recurso 11,243) y se le desestimó la apelación en 22 de mayo de 1958. Días después compareció Mary Sánchez al Tribunal de instancia y alegó que había obtenido una sentencia de divorcio en el Estado de Alabama que sancionó un acuerdo con su esposo en que del balance de la sentencia no satisfecho de $9,397.48 correspondería a ella el 75%. Solicitó del Tribunal que dictara orden dividiendo la sentencia no pagada de modo que $7,048.11 le correspondieran a ella y la diferencia a su ex-marido.

En junio 20, 1958 la Sala de San Juan del Tribunal Superior dispuso que la sentencia fuera enmendada haciendo constar que de la misma tres cuartas partes correspondían a la allí compareciente Mary Sánchez, y que ella podría ejecutar separadamente y a su favor el balance no satisfecho de la sentencia hasta el referido monto. En julio 10 se expidió mandamiento de ejecución de esa parte de la sentencia el cual fue diligenciado negativamente por el alguacil por no encon-

trar bienes. En julio 22 la demandante pidió que se citara a la demandada para que declarara en cuanto a sus bienes, y en septiembre 3, 1958 la Sala de instancia ordenó que se registrara sentencia contra el socio Héctor Sánchez y a favor de Mary Sánchez por la cantidad de $7,048.11. Se hizo constar que Héctor Sánchez, como socio gestor de la sociedad demandada, había declarado que la sociedad no tenía bienes de clase alguna sobre los que se pudiera realizar embargo. Solicitada la reconsideración, la Sala sentenciadora sostuvo la obligación de Héctor Sánchez de responder con sus bienes personales del pago de la referida sentencia. Para revisar esa resolución expedimos certiorari.

Sostiene el recurrente que la Sala no podía enmendar la sentencia después de haber sido confirmada [desestimada] por este Tribunal. No nos detendremos en este punto porque no existió enmienda sustantiva de la sentencia que pudiera cambiar el mandato. Siendo la sentencia a favor de la sociedad ganancial, la actuación de la Sala de instancia no tuvo otro efecto sino el de hacer constar en los autos del caso la parte que le correspondía a cada cónyuge al liquidarse dicha sociedad en virtud de decreto de divorcio. Tampoco nos detendremos ante el planteamiento de que la Sala sentenciadora no podía ordenar que se registrara sentencia a favor de Mary Sánchez y contra el recurrente Héctor Sánchez sin haber sido él demandado, porque aunque se dispuso así, lo que en derecho se resolvió y que constituye el problema aquí envuelto fue que no existiendo bienes de la sociedad demandada, la sentencia contra ella podía ejecutarse en bienes personales del socio Héctor Sánchez.

La demanda enmendada alegó que la demandada Héctor Sánchez S. en C., era una sociedad en comandita organizada en enero de 1947 y se dedicaba entre otras cosas a la manufactura de hielo bajo el nombre de Puerto Rico Ice, Inc., siendo socio gestor el aquí recurrente Héctor Sánchez y socio comanditario Gabriel Espasas. Esa alegación fue admitida de ma-

nera expresa en la contestación. En el juramento a un interrogatorio, Héctor Sánchez dijo ser *comerciante* y socio gestor de Héctor Sánchez, S. en C. Ante lo expuesto, y no existiendo otros hechos en los autos que demuestren lo contrario entendemos, y en esa forma dispondremos de este caso, que se trataba de una sociedad mercantil. (¹)

El art. 104 del Código de Comercio, (ed. 1932) dispone que todos los socios que formen la compañía colectiva, sean o no gestores de la misma, estarán obligados personal y solidariamente, *con todos sus bienes*, a las resultas de las operaciones que se hagan a nombre y por cuenta de la compañía, bajo la firma de ésta y por persona autorizada para usarla. En cuanto a la compañía en comandita, como la aquí envuelta, dispone el art. 125 que todos los socios colectivos, sean o no gestores de la compañía en comandita, quedarán obligados personal y solidariamente a las resultas de las operaciones de ésta, *en los propios términos y con igual extensión que los de la colectiva*, según dispone el art. 104. Esto significa que los socios colectivos, gestores o no de la compañía en comandita responden también solidariamente con sus bienes particulares de las operaciones de la sociedad. Relacionado con el problema ante nos está igualmente el art. 156 del propio Código, el cual dispone que los bienes particulares de los socios colectivos que no se incluyeron en el haber de la sociedad al formarse ésta, no podrán ser ejecutados para el pago de las obligaciones contraídas por ella, sino después de haber hecho excusión del haber social.

Se trata aquí de una obligación de la sociedad en sí, en virtud de la sentencia que la responsabilizó por culpa extra-

---

(¹) Si era una sociedad civil, otras normas entrarían en consideración. Art. 1859 Cod. Civil, (ed. 1930). Los tratadistas españoles aunque acordes en que en la sociedad civil la responsabilidad de los socios no es solidaria y sí mancomunada, discrepan hondamente en cuanto a si los socios, aunque mancomunadamente, han de responder o no con sus bienes particulares de las deudas de la sociedad, no expresando nada el Código. Santamaría resume los criterios y se abandera a uno de ellos:—pág. 722, Tomo II de sus *Comentarios al Código Civil*, 1958.

contractual a tenor de la responsabilidad en que bajo el art. 1803 del Código Civil incurren por actos de terceras personas los dueños o directores de un establecimiento o empresa respecto de los perjuicios causados por sus dependientes en el servicio de los ramos en que los tuvieren empleados o con ocasión de sus funciones.(²)   No se trata por lo tanto de una obligación contractual de la sociedad.   En torno a este punto gira fundamentalmente el problema en este caso, o sea si ante este tipo de responsabilidad no contractual puede aplicarse lo dispuesto en el art. 104 del Código de Comercio. Casos como *M. Lamadrid & Co.* v. *Torrens Martorell*, 28 D.P.R. 879; (véase, 27 D.P.R. 599), *Gregory* v. *El Tesorero*, 24 D.P.R. 94; *Acha* v. *Corte de Distrito*, 31 D.P.R. 153; *Morales* v. *González*, 35 D.P.R. 777, particularmente el de *Lamadrid* no prestan ayuda porque no tratan de responsabilidad extracontractual.

Examinando las sentencias del Tribunal Supremo de España hasta donde nos ha sido posible el examen en relación con los arts, 267 y 352 del Código de Comercio de 1829 y sus equivalentes el 127 y 237 del de 1885 (arts. 104 y 156 del nuestro de la edición de 1932), no hemos encontrado caso en que de acuerdo con los hechos se trate de una responsabilidad no contractual de la sociedad.(³)   Los tratadistas que hemos tenido la oportunidad de consultar tampoco mencionan, dis-

---

(²) También se discute en la doctrina latina si el ente jurídico responde directamente de culpa aquiliana, ya que por ser una ficción ha de actuar a través de personas naturales que incurren o no en culpa, aunque en el caso de directores pueda ser *"in eligendo"* o *"in vigilando"*.   Borrel Macía se refiere a ello en su capítulo titulado "Responsabilidad de las Personas Jurídicas y de sus Administradores", en *Responsabilidades Derivadas de Culpa Extracontractual Civil*, 2da. ed., 1958, pág. 176.   Véase también a Garrigues, *Tratado de Derecho Mercantil*, 1947, Tomo 1 Vol. I, págs. 568-569.   En este caso la sentencia que condenó a la sociedad como tal quedó firme y no está abierta a criterio alguno,

(³) Sentencias de 17 de dic. de 1873; 13 de junio, 1883; 8 de enero, 1881; 15 de nov. de 1898; Resolución de la Dirección Gen. de los Registros de 23 de mayo dé 1898; Sent. de 27 de marzo de 1895; 20 de nov. de 1896; 23 de junio, 1903; 20 de junio de 1883; 27 de nov. de 1927; 6 de julio de 1912; 27 de dic. de 1945.

cutiendo estos artículos o refiriéndose en general a la responsabilidad del socio, al caso de una obligación de la sociedad
derivada de culpa aquiliana, si bien, por otra parte, ni en
sus exposiciones ni en la jurisprudencia hemos encontrado
tampoco expresión manifiesta en contrario, al efecto de que
la responsabilidad del socio bajo el art. 104 como resulta de
las operaciones, o bajo el art. 156, excluya una responsabilidad extracontractual de la sociedad como la envuelta en este
caso.   Garrigues, *op. cit.* toca muy de pasada el asunto, y
tampoco es el problema exacto, al expresar que "[n]o es condición necesaria para que la sociedad quede obligada frente a
tercero el empleo de la firma por un socio representante en
negocios contractuales." "El socio representante", dice,
"hace también responsable a la sociedad de sus actos ilícitos
(actos derivados de culpa o negligencia, art. 1902 del C.C.),
siempre que sean realizados en la esfera de las operaciones
sociales." Se refiere, como podrá verse, al acto ilícito o negligente del propio socio, que obligaría a la sociedad, pero alguna relación ello podría tener con el problema ante nos, ya
que la doctrina civil está conteste en que la responsabilidad
del director de una empresa (un socio gestor por ejemplo)
por el acto de su dependiente o empleado no es subsidiaria,
sino primaria y directa, presumida *prima facie* por la ley,
bajo el supuesto de la culpa *"in eligendo"* o *"in vigilando".*
Art. 1803 Código Civil, ed. 1930.   De esa culpa del socio o
director ocurrida en la esfera de las operaciones, aunque ha
habido discusión en contrario, impera el criterio de que responderá la sociedad.   Según aclaramos en el escolio  (2)
ante, la responsabilidad de la sociedad en este caso no está
abierta a discusión.   ■

. El principio del art. 104 del Código de Comercio que impone la responsabilidad solidaria de todos los socios colectivos
con todos sus bienes por las resultas de las operaciones sociales es la característica esencial que por su origen e historia

distingue a la sociedad colectiva de otros tipos de asociaciones o compañías. (⁴)

Ya las Ordenanzas de Bilbao de 1737, Cap. X, par. XIII(a), contenían el concepto de la responsabilidad ilimitada: "Todos los interesados en una Compañía serán obligados a abonar, y llevar a debida execución, a pérdida, o ganancia, qualesquiera negocios que cada compañero haga, y execute en nombre de todos con otras personas, y negociantes fuera de ella; saneando cada uno las pérdidas que puedan suceder, hasta en la cantidad del capital, y ganancias en que fue interesado, y resultaren del total de la Compañía; entendiéndose, que aquel o aquellos, baxo de cuya firma corriere la Compañía, estarán obligados, demás del fondo, y ganancias que en ella les pertenezcan, *con todo el resto de sus bienes*, habidos, y por haber, al saneamiento de todas las pérdidas, aunque estos tales, o alguno de ellos entrase sin poner caudal el dicha Compañía." *Códigos Españoles Nueva Recopilación* 1851, Tomo XII.

---

(⁴) El Profesor Rodrigo Uría, *Derecho Mercantil*, 2a. ed., 1960, nos dice sobre la sociedad colectiva, página 113 y ss., que es la más antigua de las asociaciones mercantiles nacidas en la Edad Media como forma evolutiva de las comunidades hereditarias familiares que continuaban la explotación del comercio paterno y en un principio unió sólo a personas ligadas por vínculos de sangre. En su evolución, aunque admitiendo a extraños, mantuvo el carácter personalista de confianza mutua, solidaridad y responsabilidad ilimitada entre todos sus miembros. La considera como una *comunidad de trabajo* en que, salvo pacto en contrario, todos los socios tienen la facultad de manejar los asuntos. Garrigues, pág. 511, le da igual origen en el seno de las familias de mercaderes que luego se transforma en una unidad de trabajo en que perdura el elemento de la confianza mutua. Dice que unos atribuyen el elemento de responsabilidad solidaria a la indivisión de la herencia en que los hijos respondían de las deudas comerciales de los padres como sucesores de su personalidad; otros a que los socios se comprometían de mancomún, derivándose la presunción de solidaridad en las deudas; otros del recíproco mandato de los socios o. de la comunidad de la firma. El vínculo familiar original, expresa, se transforma en contractual sin perder la nota peculiar de la relación familiar cuando el negocio se explotaba en común por el padre y por sus hijos, o por hermanos entre sí.

Don Lorenzo Benito, *Manual de Derecho Mercantil*, Tomo 3, pág. 227 y ss., sitúa esta sociedad también en la Edad Media como consecuencia del desarrollo comercial de las repúblicas italianas después de Las Cruzadas, y expone . . ." [P]ero la costumbre mercantil se encarga de ir lenta-

El Código de 1829 disponía—art. 267 equivalente al 127 de 1885, (104)—la responsabilidad solidaria de los socios a las resultas de las operaciones hechas a nombre y por cuenta de la sociedad, bajo la firma que ésta tenga adoptada y por persona autorizada para administrar los negocios. El art. 127 español de 1885 intercaló expresamente *"con todos sus bienes"* cosa que históricamente así era. Benito, *op. cit.* a la página 234 observa sobre el particular: "Y han de responder los socios personalmente, ilimitadamente y solidariamente de las *obligaciones sociales,* porque sólo así puede estimarse que la unión de los asociados frente a los terceros es lo suficientemente compacta para que el crédito de la compañía alcance el máximum de valor posible en el mercado; ya que ello implica la consagración de la fórmula que late en el fondo de todo contrato social de esta clase: uno para todos y todos para uno." ▮

---

mente modificando esto; y, por una serie de gradaciones insensibles, se admite que el socio que contrata para la sociedad tiene la representación de cada uno de sus asociados, aunque le falte la materialidad del apoderamiento, que se supone existente por una ficción. Por otra ficción se admite que el socio que firma poniendo los nombres de todos suple la presencia de éstos, y el contrato tiene la misma fuerza que si lo suscribieran todos personalmente, y así nace la razón social. Y, por último: por otra ficción, se supone existente el pacto de la solidaridad en todo contrato suscrito por el socio que legítimamente emplea la razón social, y surge entonces la compañía colectiva regular tal como ha llegado a las modernas legislaciones mercantiles."

Gay de Montellá, *Tratado Práctico de Sociedades Mercantiles* (1948), refiriéndose a la materia, página 102 y ss., le da el mismo origen medieval a la sociedad colectiva en las familias de las grandes ciudades que consagraban al comercio sus patrimonios hereditarios aún indivisos en que los hermanos herederos continuaban el tráfico paterno bajo el mismo techo, comunidad de casa, que fue el primer signo de la existencia de una sociedad comercial de responsabilidad *ilimitada.* Cuando no fueron bastantes las fuerzas económicas familiares, colaboraron parientes y amigos ligados por un contrato social. El recíproco mandato que los socios se concedían para tratar los negocios dio nacimiento a la razón jurídica basada en la garantía solidaria e ilimitada. A tal punto, dice Montellá, son importantes ambos elementos, la solidaridad y la ilimitación para caracterizar a la compañía colectiva, que es suficiente que esta solidaridad exista entre los socios para que haya compañía colectiva, aún cuando no hubiera *razón social* que la distinguiera. Porque la solidaridad en el pago de las deudas sociales no se da en ninguna otra forma de compañía mercantil ni civil.

Atendido el origen y desenvolvimiento histórico de la sociedad colectiva, la característica que la hace única en el derecho y la distingue de las demás instituciones, cual es la responsabilidad solidaria e ilimitada de sus miembros, así como la razón también histórica del imperativo económico para tal tipo de responsabilidad frente a tercero; y considerando el propio texto de los arts. 104 y 156, en ausencia de disposición expresa en contrario no habría razón para entender dicha responsabilidad solidaria e ilimitada del socio como limitada sólo a aquellas obligaciones o deudas de la compañía de tipo contractual. El art. 156 (237 español) que según Montellá está mal situado en el Código y encaja mejor al hablar de la responsabilidad de los socios colectivos, ha de considerarse *in pari materia* con el 104, ya que trata de la manera en que ha de exigírsele al socio, por un tercero, tal responsabilidad. Este artículo obliga los bienes particulares del socio, previa excusión del haber social, *al pago de las obligaciones contraídas por la sociedad,* sin que tampoco distinga entre obligaciones contractuales y no contractuales.

Por otra parte, sabido es que de acuerdo con el art. 1042 del Código Civil, las obligaciones nacen también de la ley; y esta es una obligación que los socios colectivos no pueden evadir ni tienen la libertad de pactar en contrario contra ella en cuanto a tercero se refiere. En sentencia del Tribunal Supremo de España de 27 de diciembre de 1945 se sostiene como principio general que la obligación que impone el art. 127 del Código de Comercio (104) a los socios que forman la compañía colectiva por las operaciones sociales, *es la misma que la resultante de estas operaciones para la compañía,* y negada ésta, ninguna podría exigirse en virtud de dicho artículo, a los socios. A *contrario censu,* a la luz de este principio de ser una responsabilidad exigible a la compañía, le sería exigible a los socios.

Hemos visto en el caso de autos que existe una responsabilidad u obligación de la compañía en virtud de sentencia

que la condenó a pagar daños y perjuicios. De no descargarse la sociedad de esa deuda u obligación, que incuestionablemente fue resultado de las operaciones sociales, debe responder el recurrente a tenor del art. 104. El hecho de que este artículo sujete dicha responsabilidad a las resultas de las operaciones que se hagan a nombre y por cuenta de la compañía, bajo la firma de ésta y por persona autorizada para hacerlo, no significa, como arguye el recurrente, que sólo estén envueltas operaciones contractuales. Esas disposiciones deben interpretarlas también a la luz de lo dispuesto en el art. 105 que sigue, al efecto de que los socios no autorizados debidamente para usar de la firma social no obligarán con sus actos y contratos a la compañía aunque los ejecuten a nombre de ésta y bajo su firma. En vista precisamente de la solidaridad ilimitada en este tipo de sociedades en que todos los socios colectivos, intervengan o no en las operaciones responden solidariamente e ilimitadamente, requiere el art. 104 que ello sea así cuando las operaciones sean operaciones sociales y se realicen por aquellos autorizados para la gestión. No es imposible que en las operaciones de la sociedad y en el curso de la gestión se pueda incurrir en responsabilidad extracontractual o aquiliana como ocurrió en este caso. Por otra parte, y aunque el recurrente no fue demandado en el pleito de daños y perjuicios junto con la sociedad, que pudo haberlo sido, él era el único socio gestor, no habiendo intervención del otro por ser comanditario, y como tal fue él la persona con la responsabilidad, de haber escogido primero y la de vigilancia después, sobre el empleado que causó el daño en el curso del empleo, con lo cual queda fuera de toda duda el hecho de que no se tratara propiamente de una operación de la sociedad bajo la razón social y por persona autorizada para ello. ▆

Finalmente, en este caso se cumplió con el requisito de la excusión. Art. 156. De acuerdo con las sentencias españolas, y nuestros propios casos de *M. Lamadrid* y *Morales*

v. *González*, ante, el recurrente pudo haber sido demandado en su origen conjuntamente con la sociedad, aunque no lo fue. Tampoco había obligación de incluirlo. Está decidido en la doctrina que la responsabilidad del socio en tal situación es una subsidiaria o secundaria a la de la sociedad, y no una responsabilidad en primer lugar. En este caso, si bien el recurrente no fue demandado en un principio, fue oido en cuanto al beneficio de excusión ya que la sociedad fue citada y él mismo aportó la prueba en corte al efecto de que dicha sociedad de la cual él es gestor carecía de bienes. No era necesario que en ese momento se entablara un pleito por separado contra él por la acreedora. Hemos dicho, *Lamadrid y Co.*, que la posición del socio en tal situación es similar a la de un fiador. Pueden seguirse procedimientos similares a los dispuestos en el procedimiento civil para el caso de tales fiadores.

*Por todo lo anteriormente expuesto se anulará el auto de certiorari expedido y quedará en toda su efectividad la resolución dictada por la Sala de San Juan del Tribunal Superior en 14 de octubre de 1958 que ordenó la ejecución del remanente de la sentencia en bienes personales del recurrente.*